| | | |
|---|---|---|
| WILLIAM LOUGHNER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 10266 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| AAR AIRLIFT GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Loughner has sued his former employer, Defendant AAR Airlift Group, Inc. (Airlift), alleging retaliation under Florida's Private Whistleblower Act, Fla. Stat. § 448.102(3).[1] R. 21, Am. Compl. ¶¶ 25-30.[2] Loughner, a helicopter pilot, claims that Airlift fired him for refusing to participate in a flight evaluation because he believed that he was medically unfit to fly under a Federal Aviation Administration (FAA) regulation, namely 14 C.F.R. § 61.53. Am. Compl. ¶¶ 25-30. Airlift, in turn, has filed a counterclaim against Loughner for breach of

---

[1]This Court has subject matter jurisdiction over Loughner's claim under 28 U.S.C. § 1332. There is diversity of citizenship because Loughner is a citizen of Arizona, *see* R. 53, SMJ Affidavit, and Airlift is a citizen of Florida, R. 43, 9/12/16 Stip. Dismissal. The amount in controversy requirement is satisfied because Loughner is seeking more than $75,000 in damages, *id.*, and it is legally possible for him to recover more than that if he wins.

[2]Citations to the record filings are "R." followed by the docket number and, when necessary, a page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Airlift's Statement of Facts) [R. 37]; "Pl.'s Resp. DSOF" (for Loughner's Response to Airlift's Statement of Facts) [R. 45]; "PSOAF" (for Loughner's Statement of Additional Facts) [R. 45]; "Def.'s Reply DSOF" (for Airlift's Reply to Loughner's Response to Airlift's Statement of Facts) [R. 47]; and "Def.'s Resp. PSOAF" (for Airlift's Response to Loughner's Statement of Additional Facts) [R. 48], followed by a paragraph number.

contract.[3] *See* R. 22, Def.'s Ans. & Countercl. Airlift now moves for summary judgment on its counterclaim, as well as on Loughner's whistleblower claim. R. 35, Def.'s SJ Mot. For the reasons explained below, Airlift's motion is denied.

## I. Background

Because it is Airlift that moves for summary judgment, the evidence must be taken in the light most favorable to Loughner, the non-moving party, with all reasonable inferences drawn in his favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. The Parties and the Chain of Command

Loughner, a helicopter pilot, worked for Airlift—a company that provides expeditionary airlift services and specialized aircraft modifications to government and defense customers—from July 2012 to May 2014. R. 37, DSOF ¶¶ 4-5, 43.[4] During the time that Loughner worked for Airlift, Interim Chief Pilot Scott Tripp directly supervised Loughner, and Director of Operations Jayson Wilson directly supervised Tripp. *Id.* ¶ 6.

### B. Airlift's Training Practices

Airlift's custom is to conduct Pilot-in-Command (PIC) training for all new employees. DSOF ¶ 7. PIC training concludes with an examination, known as a "check ride." *See id.* (Airlift pilots also simultaneously undergo a Part 135

---

[3]This Court has supplemental jurisdiction over Airlift's counterclaim under 28 U.S.C. § 1367.
[4]Where a fact is admitted, only the asserting party's statement of facts is cited; where an assertion is challenged, it is so noted.

evaluation.[5] *Id.* ¶ 9.) If a pilot completes PIC training but is not yet ready for a check ride, Airlift will certify that pilot at the Second-in-Command (SIC) level instead. *Id.* ¶ 7.

A PIC check ride has two parts: (1) an oral examination and (2) a flight evaluation. DSOF ¶ 7. Upon completing a PIC check ride for a particular aircraft, a pilot becomes "type rated" in that aircraft, meaning that he or she can go to another employer and be qualified—under FAA standards—to fly that type of aircraft. *Id.* ¶ 8. Both PIC- and SIC-certified pilots must complete yearly training to stay certified on any aircraft that they are authorized to fly. *Id.* ¶ 9.

### C. Loughner's S-61 Training (2012-2013)

As a new hire, Loughner completed training on the Sikorsky S-61 aircraft but did not receive a PIC type rating; instead, he was certified at the SIC level. DSOF ¶ 10. Loughner was scheduled to complete training to upgrade to the PIC level on the S-61 in August 2013, but he decided to skip that training to visit his wife and newborn daughter in Colombia (where they lived, *id.* ¶ 5).[6] *Id.* ¶ 11; *see* R. 47-1, Loughner Dep. Excerpt at 3. In lieu of the PIC upgrade training, Loughner re-upped his SIC training to maintain his certification. DSOF ¶ 11.

---

[5]Part 135 refers to a section of the Code of Federal Regulations that imposes additional training and documentation requirements on pilots. DSOF ¶ 9.

[6]Loughner objects to this statement of fact on the ground that it is not supported by the materials that Airlift cites. R. 45, Pl.'s Resp. DSOF ¶ 11. Airlift, however, has provided a supportive citation to Loughner's deposition in its Reply to Loughner's Response to Airlift's Statement of Facts. *See* R. 47, Def.'s Reply DSOF ¶ 11; R. 47-1, Loughner Dep. Excerpt at 3. So there is no longer any reason to consider this fact to be in dispute (but even if there were, the fact is immaterial).

**D. The Training Reimbursement Agreement and Loughner's S-92 Training**

Almost a year after he was hired, in June 2013, Loughner entered into a Training Reimbursement Agreement (for convenience's sake, the "Agreement") with Airlift. DSOF ¶ 13; *see* R. 44-1, Agreement. In the Agreement, Airlift agreed to pay 100% of the costs to train Loughner on a new type of aircraft—the Sikorsky S-92. Agreement at 1. Loughner, in exchange, agreed to repay Airlift if he "le[ft]" the company—excepting certain circumstances—within the year following the completion of his S-92 training:

> In the event [Loughner] leaves the Company prior to the Minimum Employment Period [(one year following his completion of the Training Program)], regardless of his or her reason (with the exception of a furlough, an unexpected loss of medical certificate or airman certificate, or an extreme immediate family emergency), [Loughner] agrees to repay [Airlift] a percentage of the Training Costs, plus Expenses incurred ….

*Id.*

Loughner successfully completed PIC training for the S-92 in August 2013. DSOF ¶ 12. It cost Airlift $51,500 to provide him that training. *Id.*

**E. Loughner's S-61 Training (2014)**

In March 2014, Loughner and another pilot, Bruno Guzman, went to Newberg, Oregon to undergo PIC upgrade training on the S-61. *See* DSOF ¶ 14. Airlift Flight Instructor Gary Walton was present to conduct the training, while Pilot Examiner Joe Brigham and Airlift Check Airman Ian Costello were present to evaluate Loughner.[7] *Id.*; R. 38-3, Costello Dec. ¶¶ 6-7.

---

[7]Brigham, an FAA designee, was present to administer the type-rating evaluation on behalf of the FAA, while Costello was present to administer the Part 135 evaluation on behalf of Airlift. DSOF ¶ 14.

# 1. Oral Examination

Loughner completed his training with Walton, and then Costello and Brigham administered the oral examination portion of Loughner's check ride. *See* DSOF ¶ 15; R. 38-2, Brigham Dec. ¶¶ 5-6; Costello Dec. ¶¶ 6-7. As part of the test, Brigham asked Loughner a number of scenario-type questions.[8] DSOF ¶ 15. Brigham remained friendly and patient throughout the exam, emphasizing the availability of reference materials. *Id.* Loughner, meanwhile, struggled to respond and gave substantively unacceptable responses to certain questions. *Id.* Ultimately, after Loughner provided several wrong answers, Brigham stated that Loughner's performance was unsatisfactory and terminated the exam. *Id.* ¶ 16. Loughner had never failed an oral examination before, so this caused him a great deal of stress. R. 45, PSOAF ¶ 3.[9]

According to Loughner, Costello suggested at that point that Loughner consider abandoning the upgrade training and returning at some future date for another attempt. R. 45, Pl.'s Resp. DSOF ¶ 16; R. 45-2, Loughner Dec. ¶ 4.[10] Brigham, however, explained to Loughner why he had failed and, although

---

[8]This is the FAA's preferred method of oral examination. DSOF ¶ 15.

[9]Airlift disputes that failing the oral exam caused Loughner to experience stress because Loughner failed to mention that it caused him stress in his deposition or in the statement he prepared for Tripp describing what had happened in Newberg, Oregon, *see* R. 45-2, Exh. 1 to Loughner Dec., Prepared Statement at 9-13. *See* R. 48, Def.'s Resp. PSOAF ¶ 3. But Loughner did mention experiencing stress in his declaration, R. 45-2, Loughner Dec. ¶ 3, and it is reasonable to infer that failing an exam would be stressful to an exam taker. So, even though the earlier omissions might be fodder for cross-examination, for the purposes of evaluating a summary judgment motion, PSOAF ¶ 3 is credited in its entirety (as are the portions of PSOAF ¶¶ 4 and 7 that state that Loughner's poor exam performance caused him stress).

[10]Airlift alleges, in contrast, that Costello suggested that Loughner be given a chance to retrain and retake the oral exam. DSOF ¶ 16. For summary judgment purposes, Loughner's version of what happened is credited.

Brigham was under no obligation to do this, he allowed Loughner to receive additional instruction from Walton and then to resume the exam. DSOF ¶¶ 16-17.

Loughner's evaluation picked back up in the early evening, at which time Brigham re-asked the questions that Loughner had answered incorrectly earlier in the day.[11] DSOF ¶ 18. This time, Loughner's responses were satisfactory (though Costello found Loughner's knowledge in certain areas to be surprisingly weak). *See id.* ¶ 19.

### 2. Loughner's Communications with His Wife

Throughout the day of the oral exam, Loughner's wife had been texting him that she urgently needed money.[12] PSOAF ¶ 4. Loughner spoke with her on the phone that evening, at which time he told her that he would get her the funds that she needed. *Id.* Loughner's wife was very emotional during the call, and speaking to her made Loughner feel even more stressed. *Id.*[13] After they hung up, Loughner tried but could not fall asleep. *Id.*

---

[11]Brigham could have instead asked new or revised questions. DSOF ¶ 18.

[12]Loughner's wife had been injured in a car accident in 2006, and needed money to travel to meet with her attorney about the resulting lawsuit. *See* PSOAF ¶ 4.

[13]In addition to disputing that Loughner experienced any stress as a result of failing his oral exam, *see supra* n.9, Airlift also claims that the fact that Loughner's wife was very emotional when she spoke with him is "inadmissible hearsay." Def.'s Resp. PSOAF ¶ 4. Loughner is presumably characterizing his wife's mental state based on her tone of voice, which is not a "statement" covered by the rules against hearsay, so this objection fails. *See* Fed. R. Evid. 801(a). And even if Loughner outright based this characterization on statement by his wife to the effect of, "I'm stressed out," that would be a statement as to her then-existing state of mind, which is an exception to the ban against hearsay. Fed. R. Evid. 803(3).

### 3. Flight Evaluation

Loughner was scheduled to complete the flight portion of his PIC check ride at 8:00 a.m. the day after his oral evaluation. PSOAF ¶ 5; DSOF ¶ 23. But weather conditions that morning were poor so Costello and Brigham pushed the evaluation back until 11:00 a.m. or 12:00 p.m. when they believed conditions would become suitable for flying. DSOF ¶ 23. Loughner, extremely tired from the lack of sleep the night before, arrived at the training site around 10:45 a.m. *Id.*; PSOAF ¶ 5. Given the weather delay, Loughner asked Brigham and Costello for permission to drive to a nearby bank so that he could wire his wife the money that she had requested. PSOAF ¶ 5. Neither Brigham nor Costello objected. *See id.*

Loughner then drove to a U.S. Bank and completed the wire transfer. DSOF ¶ 24. Afterward, he called his wife from the bank's parking lot and told her that he would not be visiting her in Colombia after his training (as they had originally planned) because he was scheduled to deploy to Afghanistan in two days. PSOAF ¶ 6. Loughner's wife was very dismayed by this news and began to cry. *Id.*

When the call ended, Loughner drove back to the training site. *See* DSOF ¶ 25. At that point, he was feeling upset by the recent conversation with his wife and by his performance on the oral exam the day before, as well as tired from lack of sleep. PSOAF ¶ 7. Loughner came to the conclusion that the stress and fatigue he was experiencing rendered him medically unfit to fly under FAA regulations, specifically 14 C.F.R. § 61.53.[14] *See* PSOAF ¶ 7.[15] So, when he arrived at the flight

---

[14]Under 14 C.F.R. § 61.53(a)(1), "a person who holds a current medical certificate … shall not act as pilot in command, or in any other capacity as a required pilot flight

training area, he told Brigham and Costello that because he had not slept well the night before, and because his mind was preoccupied with family problems, he should not be flying that day.[16] *Id.* ¶ 8; DSOF ¶ 25. In response, Costello asked Loughner if he wanted to postpone his flight evaluation until later in the day or until the following day. DSOF ¶ 26. Loughner did not respond. *Id.* Costello was surprised, but he and Brigham agreed to call off the evaluation. *Id.* Neither Brigham nor Costello, however, understood Loughner to be grounding himself for medical reasons. *Id.* ¶¶ 26, 28.

Brigham was required to fill out paperwork for the FAA regarding the discontinuance of the exam, and it took him roughly 45 minutes to complete it all. PSOAF ¶ 9; DSOF ¶ 28. Brigham listed the reason for discontinuance as "OTHER EARLY WEATHER DELAY AND APPLICANT HAD PERSONAL EMERGENCY."

---

crewmember, while that person … [k]nows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation." In other words, a pilot is required to ground himself if he is suffering from a medical condition (including a mental health condition) that could jeopardize his ability to fly safely. DSOF ¶ 21. This is known as "medical self-grounding." *Id.* A pilot need not obtain a doctor's approval before medically self-grounding, and there are no magic words that a pilot must use in order to ground himself for medical reasons. PSOAF ¶ 7.

[15]Airlift disputes Loughner's claim that he "felt that he was medically unfit to fly," PSOAF ¶ 7, because Loughner "never told anyone at Airlift that he was mentally unfit to fly," Def.'s Resp. PSOAF ¶ 7. But Loughner's failure to say the magic words "medically unfit to fly" does not mean that he did not *feel* that he was medically unfit to fly. What's more, Airlift has admitted that there are no fixed, specific words that a pilot must use to excuse himself from flying for medical reasons. *Id.*

[16]Airlift claims that Loughner said something like "I don't feel like I can fly today," instead of something like I "should not be flying" today. Def.'s Resp. PSOAF ¶ 7. To the extent that there is any material difference between these two statements (the Court does not think that there is), the Court credits Loughner's version of what happened.

DSOF ¶ 28.[17] Once Brigham finished filling out the necessary forms, Loughner gathered his belongings and returned to his assigned quarters. PSOAF ¶ 9.

Meanwhile, Costello called Tripp (Loughner's direct supervisor) to tell him what had happened. DSOF ¶ 27. When Costello returned from that call, Loughner was gone. *Id.* Costello attempted to contact Loughner but received no response. *Id.* So Costello told Walton that if he saw Loughner he should tell Loughner to contact Tripp immediately. *Id.* Walton did as Costello asked. PSOAF ¶ 15.

Later that same day, Airlift's Training Manager, Glenn Albert, called Loughner to find out if he was okay, PSOAF ¶ 19, and to ask if Loughner wanted to stay in Oregon to re-up his SIC training on the S-61 the next day, DSOF ¶ 29. This would spare Airlift significant future expense. *Id.* Loughner told Albert that his SIC certification was good until August and that he would prefer to return to Afghanistan as scheduled. *Id.* Albert discussed the issue with Costello and Tripp and they jointly decided to terminate Loughner's training. *See* PSOAF ¶ 19. Albert, like Brigham and Costello, did not understand Loughner to have grounded himself for medical reasons under 14 C.F.R. § 61.53. DSOF ¶ 30.

According to Airlift, the following day Costello was informed that Loughner had told Walton that he (Loughner) had not wanted to complete his evaluation because he believed Costello and Brigham were going to fail him. *See* DSOF ¶ 31. (Loughner denies ever saying this to Walton. PSOAF ¶ 9.) Costello then sent an email to Wilson, Tripp, and Albert informing them that Loughner had told Walton

---

[17]If Brigham had understood Loughner to be grounding himself for medical reasons, then Brigham would have been required to list this as the reason for discontinuance. DSOF ¶ 28.

that he (Loughner) believed he was being set up to fail. *See* DSOF ¶ 31; R. 38-3, Exh. A to Costello Dec., Costello Email at 9.[18] In that email, Costello disavowed treating Loughner unfairly and claimed instead that Loughner had failed to apply himself. *See* Costello Email at 9.

That same day, Loughner spoke to Wilson (Tripp's direct supervisor) via telephone. PSOAF ¶ 13; DSOF ¶ 32. During their conversation, Loughner explained that he did not complete his PIC upgrade training because of ongoing family issues. PSOAF ¶ 13.[19] Wilson ultimately approved Loughner's return to Afghanistan. *Id.*

After speaking with Wilson, Loughner left Oregon and traveled to his home in Arizona. DSOF ¶ 34. Loughner had tried, without success, to get ahold of Tripp before his departure. PSOAF ¶ 15. He thought that it would be okay for him to leave anyway because he had Wilson's approval and Wilson was Tripp's boss. *See id.*[20] Loughner, however, did not tell Wilson during their call that he had not yet spoken to Tripp about the discontinuance of his training. DSOF ¶ 32.

---

[18]For the purposes of deciding a summary judgment motion, the Court credits Loughner's claim that he never said that he believed Costello and Brigham were going to fail him. But the email that Costello sent to Tripp speaks for itself. *See* Costello Email at 9. In other words, the Court credits Airlift's assertion that Tripp was told that Loughner said he did not complete his evaluation because he felt he was being set up to fail.

[19]Airlift claims that Loughner did not tell Wilson during their phone call that he had failed to complete his upgrade training. DSOF ¶ 32. Loughner did not expressly deny this part of DSOF ¶ 32, *see* Pl.'s Resp. DSOF ¶ 32, but his Statement of Additional Facts, PSOAF ¶ 13, as well as the portion of Loughner's deposition that is cited in support of DSOF ¶ 32, *see* R. 38-7, Loughner Dep. at 37-40, undermines Airlift's assertion. (Airlift says PSOAF ¶ 13 contradicts Loughner's deposition, Def.'s Resp. PSOAF ¶ 13, but Loughner's deposition says that Loughner and Wilson discussed the fact that Loughner did not complete his training, albeit briefly, *see* Loughner Dep. at 37-40.) The Court has thus credited this portion of PSOAF ¶ 13.

[20]Airlift objects to Loughner's assertion that he believed Wilson's approval was sufficient, given Airlift's reporting structure. Def.'s Resp. PSOAF ¶ 15. Airlift claims this statement is improper because it is a statement of opinion rather than a statement of fact.

When Loughner arrived home, he discovered that he had received a message from Walton urging him to call Tripp. DSOF ¶ 34. Loughner sent Tripp an email that evening stating that he had tried to call Tripp's cell and office numbers, and had left him a message on each. *Id.* Tripp does not recall receiving an email or voicemails from Loughner, *id.*, and Loughner did not receive any response from Tripp, *id.* ¶ 35.

### 4. Guzman's Training[21]

Like Loughner, Bruno Guzman (the other pilot taking the exam in March 2014) failed to complete his S-61 PIC check ride when he was in Oregon. DSOF ¶ 44. Guzman completed the pre-evaluation training, but decided not to initiate the check ride portion because he did not believe he was ready for the test. *Id.* At that time, Tripp spoke to Guzman about re-upping his SIC certification, but Guzman declined because he wanted more time to study and prepare for the examination. *Id.* Guzman was not discharged for failing to complete the check ride, or for declining to complete his SIC recertification. *See* PSOAF ¶ 28.

---

*Id.* In support, Airlift cites *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133 (7th Cir. 1997). But *Uhl* stands for the proposition that a plaintiff's opinion of his supervisor's motives is insufficient, on its own, to support a discrimination claim, not for the proposition that a plaintiff's perception of the propriety of his own actions cannot be considered when deciding a motion for summary judgment. *See id.* at 1137. Regardless, Airlift does not dispute that Wilson was Tripp's direct supervisor, and that as such, Tripp was bound to abide by his decisions. *See* Def.'s Resp. PSOAF ¶ 17. So, as a purely factual matter, Wilson had the authority to approve Loughner's return to Afghanistan.

[21]In order to help litigants and judges sort out what facts, if any, are in dispute, Local Rule 56.1 requires parties to set forth factual contentions one-by-one, citing to support in the evidentiary record. Loughner's main statement of fact regarding Guzman, PSOAF ¶ 30, however, is not supported by citation to the evidentiary record. *See* Def.'s Resp. PSOAF ¶ 30. It is therefore stricken. *See Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010) ("[A] district court may strictly enforce compliance with its local rules regarding summary judgment motions.").

**F. Loughner's Return to Afghanistan**

Shortly after arriving in Arizona, Loughner traveled to Bagram Air Force Base in Afghanistan. DSOF ¶ 35. At the base, Loughner had several meetings with Tripp to discuss what had happened in Oregon. *Id.* ¶ 36; PSOAF ¶ 20.[22] In one of those meetings, Tripp told Loughner that Loughner had not been authorized to travel to Afghanistan. DSOF ¶ 36. Loughner pointed out that Wilson had given his authorization. *Id.* Tripp responded that he did not understand why Wilson had approved. PSOAF ¶¶ 20, 22; Loughner Dep. at 42. Regardless, as Loughner's direct supervisor, Tripp felt that Loughner should have sought authorization from him (Tripp) before leaving Oregon. DSOF ¶ 36.

Loughner and Tripp also discussed Loughner's performance on the oral exam. DSOF ¶ 37. Loughner told Tripp that some of his answers to the questions had been graded incorrectly. *Id.* He also told Tripp that he felt that Brigham and Costello had not given him a fair opportunity to pass his check ride. *Id.* Tripp disagreed with Loughner and began to question Loughner's judgment. *Id.*

Loughner and Tripp further discussed Loughner's reasons for discontinuing the check ride. PSOAF ¶ 23. Loughner told Tripp that he did not complete the flight evaluation because of stress and distraction caused by various family issues that had cropped up prior to the flight. *Id.* ¶¶ 23, 25. In particular, Loughner told Tripp that his wife had postpartum depression, DSOF ¶ 38, and that she was dealing with

---

[22]Airlift says Tripp and Loughner met three times, DSOF ¶ 36, while Loughner says they met two times, PSOAF ¶ 20. The exact number of meetings, however, is immaterial.

legal issues, *id.*; PSOAF ¶¶ 23, 25. He also told Tripp that he had felt extremely fatigued just before he was scheduled to complete the flight evaluation. *Id.* ¶ 25.

During another meeting, Tripp asked Loughner why he had declined to re-up his SIC certification before leaving Oregon. DSOF ¶ 39. Loughner stated that his certification was current through August 2014, and questioned the need to recertify sooner than that. *Id.* He pointed out that Guzman's SIC certification was up in May and yet Guzman had not been required to re-up while in Oregon. *Id.*

Tripp asked Loughner to provide him a written statement detailing what had happened in Oregon. PSOAF ¶ 24. In that statement, Loughner advised Tripp about his wife's general health issues, about her need for money while Loughner was in Oregon, and about her emotional reaction to the news that Loughner would not be returning to Colombia after his training. *Id.*; R. 45-2, Exh. 1 to Loughner Dec., Prepared Statement at 12-13. As a result, he said, his "head … was way out of the game" in the lead up to the flight evaluation. Prepared Statement at 13.

Shortly after reviewing Loughner's statement, Tripp sent an email to HR recommending that Loughner be terminated. DSOF ¶ 42; R. 38-4, Exh. B to Tripp Dec., Tripp Email at 13-14. Tripp's recommendation had several purported bases: (1) Loughner had provided shifting explanations for failing to complete his check ride; (2) Loughner had returned to Afghanistan without approval from Tripp;[23] (3) Loughner had continued to insist that Costello and Brigham were out to get him;

_____

[23]This basis was not actually mentioned in the email recommending Loughner's termination, *see* Tripp Email at 13-14, but is a basis that Tripp offered during his deposition, R. 45-3, Tripp Dep. at 29.

and (4) Loughner had performed poorly on his oral examination.[24] *See* DSOF ¶ 42; Tripp Email at 13-14; R. 45-3, Tripp Dep. at 29-30.[25] Wilson approved Tripp's recommendation and Loughner was discharged on May 12, 2014. DSOF ¶ 43. On that date, an HR representative called Loughner and told him that he was being terminated because he left Oregon without permission. *Id.* Later, in July 2014, however, he received an email from Airlift's general counsel which stated that Loughner had been fired "because [he] refused to complete the flight portion of [his] PIC S-61 type rating." PSOAF ¶ 29.

## H. Procedural History

Following his termination, Loughner filed this lawsuit against Airlift, alleging discrimination and retaliation on the basis of race (Count One), as well as a violation of Florida's Whistleblower Act (Count Two). Am. Compl. ¶¶ 17-32. Airlift, in turn, filed a counterclaim for breach of the Training Reimbursement Agreement. Def.'s Ans. & Countercl. at 11.

Loughner has since voluntarily dismissed the race and retaliation claims. R. 34, 8/10/16 Stip. Dismissal (dismissing discrimination claim); R. 43, 9/12/16 Stip. Dismissal (dismissing retaliation claim). Only his Whistleblower Act claim remains. *See* 9/12/16 Stip. Dismissal. Airlift has moved for summary judgment on that claim, as well as on its breach of contract counterclaim. Def.'s SJ Mot.

---

[24]At one point in his deposition, Tripp said that Loughner's poor oral exam performance was the "sole reason" for Tripp's termination recommendation. PSOAF ¶ 28; Tripp Dep. at 43.

[25]Loughner disputes that these are the actual bases for Tripp's recommendation, Pl.'s Resp. DSOF ¶ 42, but does not dispute that these are the bases for termination set out in Tripp's email and in Tripp's deposition, Tripp Email at 13-14; Tripp Dep. at 29-30.

## II. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). If that burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Loughner's Whistleblower Act Claim

Under the Florida Whistleblower Act, "[a]n employer may not take any retaliatory personnel action against an employee because the employee has[] … [o]bjected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102.

"[R]etaliatory personnel action" includes termination, *id.* § 448.101(5), and "law, rule, or regulation" "includes any statute or ordinance or any rule or regulation adopted pursuant to any federal, state, or local statute or ordinance applicable to the employer and pertaining to the business," *id.* § 448.101(5).

The Whistleblower Act was enacted "to protect private employees who report or refuse to assist employers who violate laws enacted to protect the public." *Golf Channel v. Jenkins*, 752 So. 2d 561, 562 (Fla. 2000) (internal quotation marks omitted). The statute is remedial in nature and, as such, courts construe it "liberally in favor of granting access to the remedy so as not to frustrate the legislative intent." *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 912 (Fla. Dist. Ct. App. 2013).

Because there is no controlling Florida state case law interpreting the Whistleblower Act, the federal courts covering Florida analyze these claims under the burden-shifting framework used in Title VII retaliation cases.[26] *See Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000); *see also Hernandez v. Mohawk Indus., Inc.*, 2009 WL 2905970, at *3 (S.D. Fla. Sept. 8, 2009); *Aery*, 118 So. 3d at 912. Under that framework, the initial burden is on the plaintiff to establish a prima facie case of retaliation. *See Pinder v. Bahamasair Holdings Ltd., Inc.*, 661 F. Supp. 2d 1348, 1351 (S.D. Fla. 2009); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To do this, the plaintiff must show "(1) that there was a statutorily protected expression; (2) that an adverse employment action

---

[26]Loughner does not argue that he has direct evidence of retaliation (like explicit comments by Airlift saying that he was fired because he grounded himself for medical reasons).

occurred; and (3) that there was a causal link between the participation and the adverse employment action." *Pinder*, 661 F. Supp. 2d at 1351. If the plaintiff is able to make a prima facie case, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. *See Sierminski*, 216 F.3d at 950. The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's purportedly legitimate reason is pretextual. *Id.*

### 1. Prima Facie Case

Airlift concedes that an adverse employment action occurred—that is, that Loughner was fired—but disputes (1) that Loughner engaged in statutorily protected expression and (2) that there is a causal link between his firing and the alleged protected expression. Def.'s Br. at 9-13. The Court holds, however, that Loughner has enough evidence (when viewed in his favor) to establish a prima facie case of retaliation.

### i. Statutorily Protected Expression

Under the Whistleblower Act, statutorily protected expression includes objections to, or refusals to participate in, any illegal activity, policy, or practice of an employer. Fla. Stat. § 448.102. Here, the alleged expression was Loughner's refusal to complete a flight evaluation that would have been in violation of 14 C.F.R. § 61.53, the FAA regulation that requires pilots to ground themselves when they believe that they are medically unfit to fly. Airlift makes three arguments for why Loughner's refusal to complete his flight evaluation is not protected by the

Whistleblower Act. The first is that the flight evaluation was not an "activity of an employer" because it "was not an evaluation Airlift conducted on its own, but rather a regulatory certification exercise conducted by the FAA (through the [FAA Designated Flight Examiner, Brigham]) in conjunction with Airlift's Check Airman[, Costello]." Def.'s Br. at 10. But, as Airlift itself admits, the check ride was conducted by Airlift personnel—just not *solely* by Airlift personnel. *See* DSOF ¶ 14. (And Airlift cites no case law suggesting that the Whistleblower Act protects only those activities that an employer conducts using only its own employees. *See* Def.'s Br. at 10-11.) What's more, the check ride was overseen by Airlift employees (like Albert), *see* PSOAF ¶ 19, and paid for by Airlift, *see* Brigham Dec. ¶ 4 (Brigham was hired and paid by Airlift to conduct the evaluation); DSOF ¶ 7 (Airlift pays for its employees' training). Under these circumstances, a jury can reasonably conclude that the flight evaluation was an activity of Airlift's.

Airlift's second argument is that Loughner did not "refuse to participate in an illegal activity" within the meaning of the Whistleblower Act because he never expressly said that he was medically self-grounding under FAA regulations. Def.'s Br. at 11.[27] But Airlift has conceded that a pilot need not use specific words to ground himself under 14 C.F.R. § 61.53. *See* PSOAF ¶ 7 ("there are no magic words

_____

[27]The only case that Airlift cites in support of this argument is *Evey v. Creative Door & Millwork, LLC*, 2016 WL 1321597 (M.D. Fla. Apr. 5, 2016). But *Evey* does not stand for the proposition that Airlift says it does: the district court in *Evey* dismissed the plaintiff's claim because he had failed to allege that the employer's practices were illegal, *id.* at *4 ("[A]lthough plaintiff may have reasonably believe[d] that the work conditions at the [construction site] were unsafe, he does not contend that those conditions were unlawful. Because the Complaint is devoid of allegations that defendants' conduct was unlawful [the whistleblower count] fails to state a claim."), not because he had failed to allege that he gave his employer notice that its practices were illegal, Def.'s Br. at 11.

a pilot must use to excuse himself from flying"); Def.'s Resp. PSOAF ¶ 7 (objecting to the first, second, third, and fourth sentences of PSOAF ¶ 7, but not the fifth). And stress and fatigue are valid bases for medical self-grounding. *See* PSOAF ¶¶ 7, 10 (defining the "IM SAFE" rubric that pilots use to evaluate their own personal emotional and physical well-being before they fly as "Illness, Medication, Stress, Alcohol, Fatigue, Eating and/or Emotion").[28] Viewing the facts and drawing all reasonable inferences in the light most favorable to Loughner, Loughner told the relevant Airlift personnel that he could not complete his flight evaluation because he was experiencing extreme fatigue and stress. *See* DSOF ¶¶ 25, 38; PSOAF ¶¶ 8, 23, 25. As such, a reasonable jury could find that Loughner notified Airlift that he was grounding himself for medical reasons under 14 C.F.R. § 61.53.

Airlift's third and final argument is that Loughner did not "refuse" to participate in an illegal activity because Airlift personnel did not try to force Loughner to fly once they were aware that Loughner had grounded himself under 14 C.F.R. § 61.53. *See* Def.'s Br. at 11-12. But as a factual matter, Loughner has shown that he declined to fly because flying in his condition (crediting his version) would have violated the law. And as a legal matter, firing Loughner for refusing to illegally fly is a "retaliatory" personnel action, Fla. Stat. § 448.102(3). Airlift has failed to point out any Whistleblower Act cases that have adopted a narrower definition of what it means to "refuse[]," Fla. Stat. § 448.102(3), to participate in an

---

[28]Airlift objects to the definition of "IM SAFE" on the ground that it is an improper legal conclusion, Def.'s Resp. PSOAF ¶ 7, but (1) the definition of a term is a fact not a legal conclusion, and (2) Airlift concedes the existence of the "IM SAFE" rubric in its response to PSOAF ¶ 10, Def.'s Resp. PSOAF ¶ 10 (admitting sentences one and two).

employer's activity. Thus, the Court holds that Loughner has established the statutorily protected expression element of his Whistleblower Act claim.

### ii. Causal Link

Airlift also argues that Loughner has failed to demonstrate a causal connection between his refusal to fly for medical reasons and his firing. Def.'s Br. at 12-13. The record evidence shows otherwise, at least when viewed in Loughner's favor. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated." *Hall v. Teva Pharm. USA, Inc.*, 214 F. Supp. 3d 1281, 1290 (S.D. Fla. 2016) (internal quotation marks omitted).[29] Viewing the facts and drawing all reasonable inferences in Loughner's favor, Loughner told Airlift personnel that he could not fly for medical reasons and was fired a short time thereafter. PSOAF ¶¶ 8, 23, 25; DSOF ¶ 25, 38, 43; *see Padron v. BellSouth Telecomms., Inc.*, 196 F. Supp. 2d 1250, 1256 (S.D. Fla. 2002) ("For purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." (internal quotation marks omitted)). What's more, he was told by Airlift's general counsel that he had been terminated because he refused to complete his flight evaluation. PSOAF ¶ 29. This is sufficient evidence of causation.

---

[29]Given that Whistleblower Act claims are analyzed according to Title VII principles, *see Sierminski*, 216 F.3d at 950, it is not clear whether the "wholly unrelated" causation standard is appropriate following the Supreme Court's adoption of a "but-for" standard for Title VII retaliation claims in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2534 (2013). Airlift does not argue for the but-for standard, however, and even if it had, because of its general counsel's email to Loughner, the Court would also hold that standard met in this case (when the evidence is viewed in Loughner's favor).

## 2. Airlift's Reasons and Pretext

Because Loughner has made a prima facie case of retaliation, the Court must address (1) Airlift's purported reasons for firing Loughner, and then (2) whether a reasonable jury could conclude that those reasons were pretextual.

The bar for proffering a legitimate reason for adverse action is not an outright burden of persuasion:

> In rebutting the plaintiff's prima facie case, a defendant employer must only produce credible evidence supporting its legitimate reasons. The employer does not bear the burden of persuasion. That burden remains with the plaintiff and is carried with evidence that the plaintiff's engagement in protected activity was a significant factor in the employer's decision.

*Padron*, 196 F. Supp. 2d at 1256 (internal quotation marks omitted).

Airlift has put forth four reasons for Loughner's termination: (1) Loughner provided shifting explanations for failing to complete his check ride; (2) Loughner returned to Afghanistan without approval (from Tripp or at all); (3) Loughner continued to insist that Costello and Brigham were out to get him; and (4) Loughner performed poorly on his oral examination. *See* DSOF ¶ 42; Tripp Email at 13-14; Tripp Dep. at 29-30; PSOAF ¶ 27. According to Tripp, the first three of these bases led him to believe that Loughner was not a trustworthy person. *See* DSOF ¶ 42. Lack of trust and poor performance are legitimate reasons to fire an employee. Airlift has met its burden of asserting legitimate reasons.

Because Airlift articulated legitimate reasons for Loughner's termination, the burden has shifted to Loughner to present evidence from which a reasonable jury could conclude that Airlift's reasons were pretextual. To prove pretext, the plaintiff

must show that the employer's "proffered reasons were a coverup for a …
[retaliatory] decision." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)
(internal quotation marks omitted). "If the employer proffers more than one
legitimate, non[retaliatory] reason, the plaintiff must rebut each of the reasons to
survive a motion for summary judgment." *Crawford v. City of Fairburn*, 482 F.3d
1305, 1308 (11th Cir. 2007). The plaintiff "may succeed in this either directly by
persuading the court that a [retaliatory] reason more likely motivated the employer
or indirectly by showing that the employer's proffered explanation[s] [are] unworthy
of credence." *Hall*, 214 F. Supp. 3d at 1294 (internal quotation marks omitted).

It is the Court's job to "evaluate whether the plaintiff has demonstrated such
weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a reasonable factfinder
could find them unworthy of credence." *Id.* (internal quotation marks omitted). "[A]
plaintiff can … create a triable issue of fact concerning an employer's [retaliatory]
intent by presenting a convincing mosaic of circumstantial evidence that would
allow a jury to infer intentional [retaliation] by the decisionmaker." *Id.* (internal
quotation marks omitted). An employer providing shifting explanations for an
adverse action, for example, may support a finding of pretext. *See Padron*, 196 F.
Supp. 2d at 1257.

Viewing the facts in the light most favorable to Loughner, a reasonable jury
could conclude that Airlift's reasons were pretextual. For one, Loughner was
expressly told by Airlift's general counsel that he was fired for refusing to complete

his flight evaluation. PSOAF ¶ 29; R. 45-2, Exh. 2 to Loughner Dec., GC Email at 14. On its own, this is damning evidence that Loughner was, in actuality, terminated for engaging in activity protected by the Whistleblower Act. To be sure, the general counsel's email did not explicitly refer to the medical self-grounding in those exact terms, but under Loughner's version of events, he had already told Airlift that he did not complete the flight evaluation because he was too fatigued and stressed. So the email in effect refers to the medical self-grounding (at least when viewed in Loughner's favor). And it is not the only evidence of pretext: Airlift personnel provided shifting explanations for Loughner's firing. Before Airlift's general counsel told Loughner that he was being fired for refusing to complete the flight portion of his check ride, Tripp had said that Loughner should be fired for (1) providing shifting explanations for failing to complete his check ride; (2) continuing to claim that Costello and Brigham were out to get him; and (3) performing poorly on his oral examination. *See* Tripp Email at 13-14. After that, an HR representative told Loughner that he was being fired for departing Oregon without permission. PSOAF ¶ 27. (A suspect justification given that Loughner had Wilson's approval to return to Afghanistan, and Tripp was aware of that approval before he fired Loughner. PSOAF ¶ 13; DSOF ¶ 36.) Tripp later said, during his deposition, that Loughner's poor oral exam performance was the "sole reason" for Loughner's firing. PSOAF ¶ 28; Tripp Dep. at 43. A reasonable fact finder could infer, especially given the general counsel's email to Loughner, that Airlift's explanations shifted because they were not the real explanations for Loughner's termination. Of course, at trial,

Loughner will no longer enjoy the benefit of reasonable inferences in his favor, and instead will bear the burden of proof.[30] So, the Court holds that there is a triable issue of fact regarding Airlift's retaliatory intent, and thus denies Airlift's motion for summary judgment on Loughner's whistleblower claim.

## B. Airlift's Breach of Contract Counterclaim

Airlift alleges that Loughner breached the Training Reimbursement Agreement by "leav[ing]" the company nine months after he completed S-92 training without partially reimbursing Airlift for what it spent on that training. Def.'s Br. at 13-14. Loughner, however, asserts that he was only required to repay Airlift if he "le[ft]" the company voluntarily; because he was fired, he owes Airlift nothing. R. 44, Pl.'s Resp. Br. at 2. The Court finds the operative provision of the Agreement ambiguous enough to require a factfinder to decide this issue at trial.

Before analyzing the Agreement's terms, the Court must decide what state's law to apply. A court exercising diversity or supplemental jurisdiction over a state-law claim applies the forum state's choice-of-law rules. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). Illinois has adopted the Restatement (Second) of Conflict of Laws to resolve conflict-of-laws issues. *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 919 (Ill. 2007). Section 187 of the Restatement applies where, as here, the parties to a contractual dispute have made an express choice of law in their contract. *Hall v. Sprint Spectrum L.P.*, 876

---

[30]Another obstacle that Loughner will face is that juries often credit the testimony of non-party witnesses (because they have no motive to shade their testimony one way or the other), so if his version of events differs from Pilot Examiner Joe Brigham, there is that extra hurdle to overcome.

N.E.2d 1036, 1041 (Ill. App. Ct. 2007); *see also Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F. Supp. 1399, 1413 (N.D. Ill. 1996). Under § 187, "the parties' choice of law governs unless (1) the chosen State has no substantial relationship to the parties or the transaction or (2) application of the chosen law would be contrary to a fundamental public policy of a State with a materially greater interest in the issue in dispute." *Int'l Surplus Lines Ins. Co. v. Pioneer Life Ins. Co. of Ill.*, 568 N.E.2d 9, 14 (Ill. App. Ct. 1990). "The choice of law issue may be waived, however, if a party fails to assert it." *McCoy*, 760 F.3d at 684

The Agreement contains a choice-of-law provision: "This Agreement in all respects shall be governed by and construed in accordance with the laws of the State of Florida." Agreement at 2. In keeping with this provision, Airlift argues that the Agreement should be interpreted according to Florida law. Def.'s Br. at 13. Loughner does not object; indeed, he cites Florida case law in his brief. *See* Pl.'s Resp. Br. at 13-15. The Court will thus abide by the Agreement's choice-of-law provision and apply Florida law. *See Lott v. Levitt*, 556 F.3d 564, 567-68 (7th Cir. 2009) (affirming district court's application of Illinois law where defendants had argued for application of Illinois law and plaintiff had not objected).[31]

Under Florida law, "[t]he polestar guiding the court in the construction of a written contract is the intent of the parties." *Okeechobee Landfill, Inc. v. Republic Servs. of Fla., Ltd. P'ship*, 931 So. 2d 942, 944-45 (Fla. Dist. Ct. App. 2006) (internal

---

[31]Even if Loughner had objected, the Court would have no reason to disregard the Agreement's choice-of-law provision. Airlift is a Florida corporation with its principal place of business in Florida, 9/12/16 Stip. Dismissal, so Florida's relationship to the parties is sufficiently substantial. And there is no obvious conflict between Florida's basic contract-interpretation principles and the fundamental public policy of Illinois.

quotation marks omitted). "It is well settled that the actual language used in [a] contract is the best evidence of" intent. *Rose v. M/V "Gulf Stream Falcon"*, 186 F.3d 1345, 1350 (11th Cir. 1999). Thus, "[w]here contractual terms are clear and unambiguous, the court is bound by the plain meaning of those terms." *Emerald Pointe Prop. Owners' Ass'n, Inc. v. Commercial Constr. Indus., Inc.*, 978 So. 2d 873, 877 (Fla. Dist. Ct. App. 2008); *see Beans v. Chohonis*, 740 So. 2d 65, 67 (Fla. Dist. Ct. App. 1999) (per curiam) ("[T]he words used by the parties must be given their plain and ordinary meaning."). "However, when contractual language is found to be ambiguous, extrinsic evidence may be considered … to ascertain the intent of the parties." *Emerald Pointe*, 978 So. 2d at 877. "A contract is ambiguous when its language is reasonably susceptible to more than one interpretation, or is subject to conflicting inferences." *Specialty Rests. Corp. v. City of Miami*, 501 So. 2d 101, 103 (Fla. Dist. Ct. App. 1987).

According to the Agreement, "[i]n the event Employee leaves the Company prior to the Minimum Employment Period, regardless of his or her reason (with the exception of a furlough, an unexpected loss of medical certificate or airman certificate, or an extreme immediate family emergency), Employee agrees to repay the Company a percentage of the Training Costs, plus Expenses incurred." Agreement at 1. The parties disagree as to whether this provision applies to both voluntary and involuntary termination, *see* Def.'s Br. at 14, or solely to voluntary termination, *see* Pl.'s Br. at 13. The Court finds that the language is reasonably susceptible to both interpretations.

As Airlift asserts, the definition of the word "leave" could include both voluntary and involuntary action. Def.'s Br. at 14; *Beans*, 740 So. 2d at 67.[32] But a contract must be interpreted "as a whole," *Ospina-Baraya v. Heiligers*, 909 So. 2d 465, 472 (Fla. Dist. Ct. App. 2005), and "leave" is modified by "regardless of *his or her* reason," Agreement at 1 (emphasis added). "His or her reason" tends to suggest a choice that the employee has made (like quitting), as opposed to a choice that the employer has made for the employee (like firing). But then the parenthetical exceptions—furlough, unexpected loss of certificate, or family emergency—add ambiguity. They purport to be the exclusive reasons for which an employee may "leave[]" Airlift without having to repay training costs—which would suggest that the Agreement covers voluntary *and* involuntary termination—but they also appear to be forms of temporary absence rather than forms of permanent separation, *see Webster's Third New International Dictionary* 923 (1986) (defining "furlough" as "a leave of absence granted by an employer to an employee" or "a temporary lack of employment due to economic conditions"). Their import, particularly when read in combination with "regardless of *his or her* reason," is thus unclear.

Because the Agreement's language is ambiguous, resolving the meaning of the contract on summary judgment would be inappropriate. *See Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988). The parties will need to present extrinsic evidence to a jury so that it can determine whether the Agreement

---

[32]Airlift cites *Beans v. Chohonis*, 740 So. 2d 65 (Fla. Dist. Ct. App. 1999), to support its argument that the use of the word "leave" in the Agreement is meant to encompass both voluntary and involuntary termination. Def.'s Br. at 14-15. But the contract language at issue in *Beans* is different: "leave" is modified by "for any reason," *Beans*, 740 So. 2d at 66, rather than "regardless of his or reason."

provision covers involuntary termination. (The parties also are free to agree to a bench trial on this claim, if they prefer.)

## IV. Conclusion

For the reasons discussed above, Airlift's motion for summary judgment is denied. The status hearing of July 6, 2017 remains as scheduled. The parties should restart settlement negotiations as promptly as possible.

ENTERED:


_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: June 27, 2017